**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| **v.** | * | **Case No. 15-mj-392-SAG** |
| **GREGORY SLAGLE** | * | |

* * * * * * * * * * * * * *

## MEMORANDUM AND ORDER

Defendant Gregory Slagle filed a Motion in Limine seeking to exclude from evidence the results of his breath test for alcohol concentration.[1] *See* [ECF No. 17]. On July 16, 2015, this Court heard arguments from both sides regarding the pending motion, and it has since reviewed the Defendant's Supplemental Memorandum and the Government's Response, [ECF Nos. 18, 23]. For the reasons set forth below, Defendant's Motion in Limine is denied.

## I. BACKGROUND

On January 4, 2015, Mr. Slagle, a licensed Virginia driver, was involved in a vehicle collision on Ruffner Road in Fort Meade, Maryland, a federal military installation. *See* [ECF Nos. 1, 3-5]. Upon arriving at the scene of the accident, officers suspected that Mr. Slagle was intoxicated, and conducted a field sobriety test, which Mr. Slagle failed. *Id.* Mr. Slagle was arrested and transported to the Directorate of Emergency Services in Fort Meade, where officers administered a breath test to determine alcohol concentration. Gov. Resp. to Def.'s Supp. Mem. 2. Prior to undergoing the breath

[1] Defendant originally filed a Motion to Suppress/Motion in Limine, [ECF No. 11], which this Court denied on July 13, 2015. *See* [ECF No. 17]. Defendant's trial was scheduled for July 16, 2015. *Id.* On that date, for the first time, Defendant requested a jury trial. *See* [ECF No. 18]. Defendant also contended that, in its denial of his Motion to Suppress/Motion in Limine, the Court had ruled only on his Motion to Suppress. *See* Hr'g on Def.'s Mot. in Lim., July 16, 2015. The Court therefore allowed a hearing on Defendant's Motion in Limine on July 16, and permitted supplemental briefing on the issues. *See id.*; [ECF Nos. 18, 23].

test, Mr. Slagle was read Maryland's "Advice of Rights" form, Form DR-15, which outlines the administrative consequences for refusal of a breath test, including suspension or revocation of a driver's license, as well as the consequences for drivers whose breath alcohol concentration exceeds the legal limit of 0.08%. *Id.* at 1; *see* Md. Code Ann. § 16-205.1, *amended by* H.B. 420, 432d Leg., Reg. Sess. (Md. 2015). Mr. Slagle's breath alcohol concentration registered at 0.20%. *See* [ECF Nos. 1, 3-5]; Def.'s Supp. Mem. 1. He was accordingly charged with four violations of the Maryland Annotated Code's Transportation Article. Def.'s Mot. to Suppress 2.

## II. LAW PERTAINING TO MOTIONS IN LIMINE

The purpose of a Motion in Limine is "to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence." *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.*, 652 F. Supp. 1400, 1401 (D. Md. 1987). Pursuant to Federal Rule of Evidence 401, evidence is relevant if it has "any tendency" to make a fact of consequence to the issues in question "more or less probable than it would be without the evidence." Fed. R. Evid. 401. Federal Rule of Evidence 403 clarifies that the Court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. To grant Mr. Slagle's Motion in Limine, then, this Court would have to determine that allowing Mr. Slagle's breath test results to be admitted at trial would be unfairly prejudicial, confuse the issues, mislead the jury, or have a dilatory effect.

There can be no reasonable argument that breath test results are irrelevant to a prosecution for driving while intoxicated. Essentially, Mr. Slagle's "Motion in Limine" seeks to re-argue the constitutional arguments made and rejected in his Motion to Suppress. Regardless, his arguments are addressed more fully below.

## III. DISCUSSION

Mr. Slagle raises two arguments in his Motion in Limine. First, he contends that Maryland law cannot be applied to suspend a Virginia driver's license because of acts the driver commits on federal land. Second, he asserts that he had a constitutional right to refuse the breath test administered to him. Neither argument is persuasive.

### A. The Assimilation of the Maryland Traffic Code in Fort Meade

The first issue is whether the officers improperly told Mr. Slagle that Maryland has authority to sanction an out-of-state driver for driving while intoxicated on the federal military installation located in Fort Meade, Maryland. The Government is prosecuting Mr. Slagle under the Assimilative Crimes Act ("ACA"). Under the ACA, persons who commit an act punishable under State law, while on federal land within that State, are subject to the State's punishments for that act. 18 U.S.C. §§ 7, 13. The ACA explicitly imputes onto persons convicted of driving under the influence of drugs or alcohol on such special federal territory all judicial and administrative penalties available in the State in which the federal territory is located. 18 U.S.C. § 13(b)(1). Maryland's administrative penalties include the ability to sanction out-of-state drivers. *See* Md. Code Ann. Transp. § 16-205.1(b)(1)(ii) (2014) (providing that a nonresident who refuses to consent to a breath test, or consents to a breath test that indicates an alcohol concentration above the legal limit, is subject to suspension of driving privileges for various lengths of time depending on the nonresident's driving record).

Mr. Slagle argues that his consent to the breath test was obtained in error, and that all results must be excluded at trial. In obtaining Mr. Slagle's consent, the charging officer read him the Maryland Advice of Rights form regarding sanctions for drunk driving and refusing to consent to a breath test, Form DR-15, and later charged him with violating Maryland law. *See* Md. Code Ann.

§§ 16.205-1 (2014), *amended by* H.B. 420, 432d Leg., Reg. Sess. (Md. 2015); 21-902. According to Mr. Slagle, the officer had no authority to read him the Maryland DR-15 form or to charge him under Maryland law because Maryland law does not govern traffic stops on Fort Meade, a federal military enclave. *See* Def.'s Supp. Mem. 4. Mr. Slagle asserts that Fort Meade's roads are "beyond the contours of State power." *Id.*

Despite Mr. Slagle's contentions, this matter does not present a federalism issue. The question is not whether the ACA, and, by extension, the laws of the State of Maryland, generally, apply to acts committed within Fort Meade. By the express language of the ACA, they do. *See* 18 U.S.C. § 13(a) ("Whoever within or upon any of the places now existing . . . as provided in section 7 of this title . . . is guilty of any act . . . which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . shall be guilty of a like offense and subject to a like punishment."); 18 U.S.C. § 7(2) ("The term "special maritime and territorial jurisdiction of the United States," as used in this title, includes: [a]ny lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof . . . for the erection of a fort . . ."); 45 C.F.R. § 3.2(f) (listing, among other Maryland State offenses, drunk driving as a matter "governed . . . by the current version of the cited Maryland criminal statutory provisions, which are made Federal criminal offenses under the Assimilative Crimes Act"); *see also United States v. Sharpnack*, 355 U.S. 286, 291 (1958) (upholding the Assimilative Crimes Act and noting that the "series of substantial reenactments [of the ACA] demonstrates a consistent congressional purpose to apply the principle of conformity to state criminal laws in punishing most minor offenses committed within federal enclaves.").

Instead, the question is whether *these particular Maryland laws*, that is, the relevant portions of Maryland's traffic code used to obtain Mr. Slagle's consent and to charge him with drunk driving,

are applicable to acts committed within Fort Meade. Central to that determination is whether Fort Meade qualifies as a "highway" or a "private property that is used by the public in general" under the Maryland Transportation Code's definitions and usage of those terms. If the road in Fort Meade constitutes a highway or a private property used by the public in general, then Maryland's laws regarding sanctions for driving under the influence govern. Both prongs are met here.

Driving under the influence of alcohol is codified as an offense in section 21-902 of the Maryland Annotated Code's Transportation Article. Md. Code Ann. Transp. § 21-902. Significantly, section 21-101.1 provides that Title 21 of the Transportation Article—the Title in which drunk driving is charged as an offense—proscribes offenses involving "the driving of vehicles on highways" and "any private property that is used by the public in general." *Id.* at § 21-101.1. Most relevant to this case, section 11-127(2) of the traffic code expressly states that "[f]or purposes of the application of State laws," a highway is "the entire width between the boundary lines of any way or thoroughfare used for purposes of vehicular travel on any property owned, leased, or controlled by the United States government and located in the State." *Id.* at § 11-127(2). This inclusion of roads on federal property in the definition of "highway" came as a result of a 2007 legislative amendment to section 11-127. *See* S.B. 35, 423d Leg., Reg. Sess. (Md. 2007) ("An Act concerning Transportation – Highways – Federal Property, For the purpose of altering the definition of "highway" . . . to include a certain part of any way or thoroughfare owned, leased, or controlled by the United States government and located in the State.").

In fact, the amendment arose as a direct response to this Court's decisions in *United States v. Patrick*, No. CRIM 05-3950M, 2006 WL 83505 (D. Md. Jan. 12, 2006), and *United States v. Robson*, 391 F. Supp. 2d 383 (D. Md. 2005), where the Court, citing precedent from the Fourth Circuit in *United States v. Smith*, 395 F.3d 516 (4th Cir. 2005) and *United States v. Adams*, 426 F.3d

720 (4th Cir. 2005), acquitted defendants for traffic and handgun offenses committed on federal enclaves and prosecuted under the ACA. *See* Nora C. McArdle, Fiscal and Policy Note, Analysis of S.B. 35, 423d Leg., Reg. Sess. (Md. 2007), at 2-3 (2007). The defendants in *Patrick* and *Robson* were acquitted because, at the time, the federal enclaves did not meet Maryland's statutory classification of a "highway." Prior to the 2007 amendment, "highway" had been defined only as "the entire width between the boundary lines of any way or thoroughfare (road) of which any part is used by the public for motor vehicle travel." *See id.* at 1. In the 2007 amendment's accompanying Fiscal and Policy Note, the legislature explained that, in the wake of the Fourth Circuit's decisions in *Smith* and *Adams*, which concerned assimilated Virginia state law, the Virginia legislature had enacted legislation redefining "highway" to include roads on federal property. *Id.* at 3. The U.S. Department of Justice warned that if Maryland did not similarly address the gap in its definition of "highway," the federal government would have to adopt separate traffic laws unique to federal property in Maryland, which would "cause confusion and inconsistencies." *Id.* Thus, Maryland amended its definition of "highway" to specifically encompass federal property like Fort Meade. *Id.*

The amended statutory definition of a "highway" is sufficient to show that the road in Fort Meade, a property owned by the United States government and located in Maryland, is a highway for purposes of Maryland's Transportation Article. Since the particular Maryland laws used to obtain Mr. Slagle's consent and sanction him for driving while intoxicated govern conduct on highways, and, since the road in Fort Meade is a highway, the officers' actions were proper.[2]

[2] As this Court noted in the opinion denying Mr. Slagle's Motion to Suppress, [ECF No. 17], this Court previously held in *United States v. Sauls* that Maryland's breath test consent law is procedural, rather than substantive, and, thus, is not assimilated under the ACA. 981 F. Supp. 2d 909, 911 (D. Md. 1997) ("The Court agrees that the Maryland Statute [Md. Code Ann. Transp. § 16-205.1] establishes a procedural provision outside the ambit of the Assimilative Crimes Act."); *see Slagle*, No. 15-MJ-392-SAG, 2015 WL 4365316, at *2 (D. Md. July 13, 2015). The *Sauls* Court held that the federal implied consent statute, rather than Maryland's Form DR-15, should have been read to the Defendant, who was charged with drunk driving while on the roads in Fort Meade. *Sauls*, 981 F. Supp. at 913.

Moreover, Fort Meade also meets the common law definition of "private property that is used by the public in general." [3] *See* Md. Code Ann. Transp. § 21-101.1 ("The provisions of this title . . . refer only to the driving of vehicles on highways, except . . . [a] person may not drive a motor vehicle in violation of any provision of this title on any private property that is used by the public in general."). In *United States v. Taylor*, this Court held that the phrase "used by the public in general" is a "fact specific inquiry dependent on the extent of public use, as opposed to the owner's right to exclude the public." 441 F. Supp. 2d 747, 754 (D. Md. 2006). The Court in *Taylor* further noted that the Maryland legislature's purpose in including property "used by the public in general" in the type of property within Title 21's scope was "clearly to cover those roads which might not meet the [former] definition of a "highway," but otherwise receive significant public use." *Id.* Construing the

---

This Court accepts *Sauls*'s conclusion that section 16-205.1 is procedural, rather than substantive, and is thereby not assimilated. However, this Court reiterates its finding that, like in *Sauls*, even if the federal implied consent statute was the proper form to be read to Mr. Slagle, the error in reading him the DR-15 form instead of a similar federal form statute was harmless. *See Slagle*, 2015 WL 4365316, at *2; *Sauls*, 981 F. Supp. at 913. Moreover, in the instant case, using Maryland's DR-15 form did not violate Mr. Slagle's due process rights. If anything, use of Maryland's DR-15 form better comports with the principles of due process, since it correctly advised Mr. Slagle of the administrative penalties he would incur for refusing to take the breath test, which the federal form would not have done.

Maryland's breath test consent statute informs any person who "drives . . . a motor vehicle on a highway or private property used by the public in general" that he or she, by virtue of driving on the highway or public road, is "deemed to have consented . . . to take a breath test." Md. Code Ann. Transp. § 16-205.1. Yet, the statute also provides that drivers "may not be compelled to take a [chemical] test." *Id.* While consent is implied, then, it may also be "withdrawn—for a price." *See Motor Vehicle Admin. v. Deering*, 438 Md. 611, 615-16, 92 A. 3d 495, 498 (2014) ("A refusal to take the test results in an administrative license suspension . . . The alternative is to take the test and risk a result that may carry lesser periods of administrative suspension . . ."). These options must apply to behavior in Fort Meade and other federal enclaves because, as discussed above, the definition of "highway" in Maryland encompasses all federally owned property. *See* Md. Code Ann. Transp. § 11-127(2). Therefore, even though section 16-205.1 is not assimilated, it still provides an administrative sanction that can be applied to drivers on Fort Meade's roads. As such, the officers' informing Mr. Slagle of Maryland's test refusal consequences was lawful, and the failure to advise him of the federal statute, which has no right of refusal, was harmless error.

[3] In both his Supplemental Memorandum and the July 16 hearing on the present motion, Mr. Slagle placed great weight on Fort Meade's status as a "closed" federal reservation. *See* Def.'s Supp. Mem. 2; Hr'g on Def.'s Mot. in Lim., July 16, 2015 ("This event did not occur on a road that's a public road in the State of Maryland. This event, this driving, took place on closed federal land."). Fort Meade's status as "open" or "closed" is irrelevant in determining the outcome of this Motion. Even if Fort Meade was deemed a "closed" base, section 11-127(2)'s inclusion of federally-owned property in its definition of "highway" brings Fort Meade squarely within the definition of that word, and, consequently, within the relevant portions of 16-205.1, which contains the language necessary to lawfully obtain consent to a breath test on highways, and 21-901, which proscribes drunk driving.

statute otherwise would lead to the "absurd and unreasonable result of exempting roads on federal enclaves . . . which are traveled by thousands of ordinary citizens, from the most basic traffic safety laws." *Id.* The *Taylor* Court also upheld the plain Webster's New Collegiate Dictionary definition of the term "private" to mean "intended for or restricted to the use of a particular person, group, or class." *Id.* at 755.

Here, as in *Taylor*, the roads in Fort Meade can be deemed "private property used by the public in general." As a preliminary matter, it is evident that Fort Meade can be considered private property because it is a gated military installation. *Cf. Taylor*, 441 F. Supp. 2d at 755. Moreover, it is equally clear that Fort Meade is used by the public in general.[4] Fort Meade is a bustling property. Each day, more than 100,000 people, including more than 60,000 military retirees living in the area, seek and use the services the fort provides. *Fort Meade 2015 Welcome Guide* 4, *available at* http://epublish.panaprint.com/publication/?i=242720. Over 50,000 employee-service members, civilians, and contractors work at Fort Meade daily. *Id.* One-day visitors are encouraged at Fort Meade, but are not required to enter the fort's "Visitor Control Center" when they arrive. Instead, they may proceed directly to a vehicle inspection station. Fort Meade Access to the Installation Page, http://www.ftmeade.army.mil/directorates/des/vcc/vcc.html (last visited Sept. 18, 2015).

While Fort Meade only has one visitor access gate and requires visitors to have a "valid purpose" for entering the installation, the gate is open twenty-four hours a day, and visitors may enter the fort to participate in one of the many public recreational activities or to visit the Fort Meade Museum or the National Cryptologic Museum, both of which are open to the general

---

[4] The Court takes judicial notice of these facts about Fort Meade, as described in these paragraphs, pursuant to Federal Rule of Evidence 201. Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

public. *Id.*; *Fort Meade 2015 Welcome Guide* 77. These features, including the requirement of a legitimate reason for entry, are nearly identical to those of Aberdeen Proving Ground, another federal military installation located in Maryland, which this Court in *Taylor* declared was clearly "used by the public in general," and further described as "main street USA." 441 F. Supp. 2d at 750. The open nature of Fort Meade, as evidenced by the fort's own promotional materials describing it as "virtually a city in itself," in addition to the extensive public access to the area, make Fort Meade an area used by the public in general under the common law understanding of that statutory term.

While rendered irrelevant by the subsequent statutory amendment and the analysis above, it is worth noting that Mr. Slagle misconstrues the holdings in *Robson*, *Smith*, and *Adams*. Mr. Slagle contends that in *Robson*, "this Court ruled that Maryland's motor vehicle laws were inapplicable to a driver stopped on a road within Andrews Air Force Base because the Base is a federal enclave controlled by a base commander." Def.'s Supp. Mem. 4. However, in contrast to Fort Meade, the *Robson* Court found that Andrews Air Force Base is "not open to the public. Every gate has signs limiting access to employees and those with authorized business. Civilians are permitted access if they possess military identification or other credentials. Unauthorized civilians or those without military identification must be escorted during their time on the base." 391 F. Supp. at 386. Likewise, in *Smith*, the court found that the access road to CIA headquarters was not a public highway under then-Virginia law because the access road had signs posted barring unauthorized admission, and "only those with authorized business" were permitted to enter. 395 F.3d at 521. Finally, Mr. Slagle contends that the Fourth Circuit in *Adams* held that a federally-owned gravel road was a closed federal enclave that "did not meet the definition of a road within the State of Virginia."

Def.'s Supp. Mem. 3-4. In fact, the gravel road at issue in *Adams* was "completely and indefinitely closed to the public" due to damage from Hurricane Isabel. 426 F.3d at 731.

Mr. Slagle's misstatements of the law demonstrate a misunderstanding of the basis for the courts' holdings in each of those three cases. The enclave in *Adams* was literally shut down, and those in *Smith* and *Robson* were effectively shut down to any persons not having authorized business on those federal properties. In their holdings, this Court and the Fourth Circuit emphasized that the roads were not "highways" because they were entirely closed off to the public. *See Robson*, 391 F. Supp. 2d at 389; ("[I]t is clear that in order to be considered "used by the public" that open access to all members of the public is necessary."); *Adams*, 426 F.3d at 732 ("The . . . [gravel road] was completely closed to public use for an undetermined period of time. The road, therefore, was not a highway under Virginia law."); *Smith*, 395 F.3d at 520 ("The presence of signs barring public entry establishes that the [CIA] access road is not open to public use, and thus is not a highway under Virginia law."). Regardless, the statutory amendment that followed the *Smith*, *Adams*, and *Robson* line of cases renders them inapposite here.

**B. Defendant's Right to Refuse the Breath Test**

Apart from his unsuccessful federalism argument, Mr. Slagle also contends that, "as a matter of U.S. Constitutional law," he had "the right not to surrender to the demand for a Breathalyser [sic] test." Mr. Slagle relies on the U.S. Supreme Court's holdings in *Schmerber v. California*, 384 U.S. 757 (1973), and *McNeely v. Missouri*, 133 S. Ct. 1552 (2013) (plurality opinion), to support his assertion that "as a matter of U.S. Constitutional law, the Defendant had the right not to surrender to the demand for a Breathalyser [sic] test." Def.'s Supp. Mem. 5. However, *Schmerber* and *McNeely* do not stand for the proposition that individuals have a constitutional right to refuse a breath test.

Instead, they advance the more limited principle that the constitutionality of warrantless bodily tests for alcohol concentration is evaluated on a case by case basis.

In *Schmerber*, the Court recognized that officers are generally required to obtain a warrant before proceeding with intrusive bodily tests. 384 U.S. at 770-71. Concomitantly, however, the Court also recognized that the warrantless blood test in that case was permissible because it was based on a reasonable belief that exigent circumstances and the imminent destruction of evidence were present. *See id.* at 770. Upholding *Schmerber*'s principles, the Court in *McNeely* held that the natural metabolization of alcohol in the bloodstream is not a *per se* exigency that justifies administering a blood test without a warrant, and that the exigency, along with other warrant requirement exceptions, "must be determined case by case based on the totality of the circumstances." 133 S. Ct. at 1556. Consent to be searched is one such exception. In determining the validity of a suspect's consent to be searched, courts must determine whether the consent was voluntary and not coerced when it was obtained. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973) ("But the Fourth and Fourteenth Amendments require that . . . consent not be coerced, by explicit or implicit means, by implied threat or covert force.").

Here, while he does not state so directly, Mr. Slagle's overall argument that he had the right to be free from "the intrusion of" the breath test impliedly asserts that Maryland's statutory scheme, which penalizes refusal of consent to a breath test, is unconstitutionally coercive. A similar argument was presented in *United States v. Sugiyama*, involving the constitutionality of the federal Advice of Rights and implied consent statutes, 36 C.F.R. § 4.23 and 18 U.S.C. § 3118. No. 15-PO-9065, 2015 WL 4092494 (D. Md. Jul. 6, 2015). In *Sugiyama*, the Defendant's vehicle crashed off the Baltimore-Washington Parkway, which is part of the special maritime and territorial jurisdiction of the United States and controlled by the National Park Service. After the Defendant refused to

submit to a blood draw, the arresting officers obtained an oral warrant from a magistrate, and the Defendant was ultimately charged with driving under the influence of alcohol and refusing to submit to a chemical test. *Id.* at *1. The Defendant contended that her charge of refusing to submit to a chemical test should be dismissed because the federal refusal statute was "unconstitutional under the Fourth Amendment." *Id.* In addition, as Mr. Slagle argues here, the Defendant in *Sugiyama* argued that "the reasoning of *Missouri v. McNeely* must apply to breath tests," and, "since a breath test cannot be compelled in the absence of a warrant, the refusal to submit to a breath test, a search, cannot be made criminal." *Id.*

The *Sugiyama* Court rightly found the Defendant's argument and reliance on *McNeely* to be meritless. In fact, the Court observed, *McNeely*'s holding runs contrary to the argument that a penalty for refusal to consent is unconstitutional. *See id.* at *3 ("In the Fifth Amendment context [in *McNeely*], the Court noted that most States allow a motorist's refusal to be used as evidence against him in a subsequent criminal prosecution. . . . The Court recognized that all 50 States have adopted implied-consent laws, which require motorists, as a condition of operating a motor vehicle within the State, to consent to [blood alcohol concentration testing] if they are arrested or otherwise detained on suspicion of a drunk-driving offense. Such laws impose significant consequences when a motorist withdraws consent . . .") (citing *McNeely*, 133 S. Ct. at 1566) (plurality opinion)).

Rational basis review is appropriate for Mr. Slagle's argument that Maryland's consent refusal penalties violate his Fourth Amendment rights. *See Sugiyama*, No. 15-PO-5065, 2015 WL 4092494, at *4 (D. Md. July 6, 2015) ("Unless a statute affects a fundamental right or some protected class, courts generally accord the legislation a 'strong presumption of validity' by applying a rational basis standard of review.") (quoting *Wilkins v. Gaddy*, 734 F.3d 344, 347 (4th Cir. 2013) (citations omitted)). The right of an arrestee suspected of driving while intoxicated to refuse a breath

test is not a fundamental right. *See Sugiyama*, 2015 WL 4092494, at *10; *Minnesota v. Chasingbear*, No. A14-0301, 2014 WL 3802616, at *2 (Minn. Ct. App. Aug. 4, 2014), *review denied* (Minn. Apr. 14, 2015). Under rational basis review, the onus is on the aggrieved party to show that the statute is not rationally related to a legitimate state interest. *Sugiyama*, 2015 WL 4092494, at *4 (citing *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 295 (4th Cir. 2007)).

In the instant case, Mr. Slagle has not met his burden. Mr. Slagle cites *McNeely* as the sole case to support his contention that individuals have a "right to be free from the intrusion" of breath tests. But, as indicated above, *McNeely* stands for the opposite principle. Further, state courts reviewing the constitutionality of state consent refusal penalties have all deemed them "reasonable and not coercive." *See Sugiyama*, 2015 WL 4092494, at *4-5 (citing various cases from state courts in Hawaii, Minnesota, and North Dakota, all upholding their respective states' consent refusal penalty statutes, which criminalized, rather than merely administratively penalized, suspects for refusing to consent to alcohol concentration testing); *see also California v. Harris*, 234 Cal. App. 4th 671, 184 Cal. Rptr. 2d 198, 213 (2015), *review denied* (June 10, 2015) ("That [a] motorist is forced to choose between submitting to the chemical test and facing serious consequences for refusing to submit . . . does not in itself render the motorist's submission to be coerced or otherwise invalid for purposes of the Fourth Amendment.").

Like the federal implied consent statute in *Sugiyama*, this Court holds that Maryland's test refusal penalty passes rational basis review. Maryland's interest in preventing drunk driving on roads within the State, including those roads on federal property within the State, is undoubtedly legitimate. Administrative sanctions for refusal to consent to a chemical test are rationally germane to this purpose. *See Mackey v. Montrum*, 443 U.S. 1, 18 (1979) ("The Commonwealth's interest in public safety is substantially served by the summary suspension of those who refuse in several ways

to take a breath-analysis test upon arrest. First, the very existence of the summary sanction of the statute serves as a deterrent to drunken driving. Second, it provides strong inducement to take the breath-analysis test and thus effectuates the Commonwealth's interest in obtaining reliable and relevant evidence for use in subsequent criminal proceedings. Third, in promptly removing such drivers from the road, the summary sanction of the statute contributes to the safety of public highways."). Because Maryland's statute passes rational basis scrutiny, it is constitutional, and its use was not coercive in Mr. Slagle's case. Thus, there are no grounds to invalidate his consent.

## III. CONCLUSION

For the foregoing reasons, it is hereby ORDERED this 6th day of October, 2015 that Defendant's Motion in Limine is DENIED.

Dated: October 6, 2015

/s/
Stephanie A. Gallagher
United States Magistrate Judge